IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MIGUEL MONICO, an individual, and
SHAWN WATTS, an individual,

          Plaintiffs,                           No. 03:13-cv-02129-HZ

     v.

CITY OF CORNELIUS, a municipality of          OPINION & ORDER
the State of Oregon; ROB DRAKE, in his
individual and official capacity; KEN
SUMMERS, in his individual and official
capacity; and JOE NOFFSINGER, in his
individual and official capacity,

          Defendants.

Daniel E. Thenell
Robert Bletko
THENELL LAW GROUP, P.C.
12909 S.W. 68th Parkway, Suite 320
Portland, Oregon 97223

     Attorneys for Plaintiffs

/ / /

1 - OPINION & ORDER

Robert E. Franz
LAW OFFICE OF ROBERT E. FRANZ, JR.
P.O. Box 62
Springfield, Oregon 97477

      Attorney for Defendants

HERNANDEZ, District Judge:

      Plaintiffs Miguel Monico and Shawn Watts bring this action against the City of

Cornelius, City Manager Rob Drake, and Police Chief Ken Summers[1], raising claims of First

Amendment retaliation, intentional infliction of emotional distress (IIED), and violation of an

Oregon whistleblower statute.  Defendants move for summary judgment on all claims.  I grant

the motion as to the Oregon whistleblower claims and the IIED claims, and I grant the motion in

part and deny it in part as to the First Amendment claims.

BACKGROUND

      Plaintiffs were both police officers with the City of Cornelius during the relevant time

period.  In October 2012, they signed a letter raising allegations of misconduct and corruption in

the City of Cornelius Police Department, particularly in regard to then-Chief of Police Paul

Rubenstein and then-Assistant Chief of Police Joe Noffsinger.  Ex. 101A to Jan. 23, 2015 Franz

Decl.  Officers Mark Jansen and Doug Schuetz also signed the letter (referred to hereinafter as

the "Corruption Complaint").  Id.  Watts hand-delivered the Corruption Complaint to Drake on

the morning of October 17, 2012.  S. Watts Depo. (Ex. 106 to Jan. 23, 2015 Franz Decl.) at 67[2];

---

    [1] Former Assistant Chief of Police Joe Noffsinger was named as a Defendant in the
Complaint but has been dismissed.

    [2] Because deposition excerpts for some witnesses were provided by both Plaintiffs and
Defendants, I cite to the Declaration to which the cited deposition excerpt is attached.

2 - OPINION & ORDER

Ex. 101A to Franz Decl.  Watts gave Drake no instructions about what to do with the Corruption

Complaint.  Drake Depo. (Ex. 4 to Thenell Decl.) at 17.  Members of the City of Cornelius City

Council also received copies of the Corruption Complaint.  S. Watts Depo. (Ex. 106 to Jan. 23,

2015 Franz Decl.) at 68; Drake Depo. (Ex. 114 to Jan. 23, 2015 Franz Decl.) at 35.  Although the

Corruption Complaint is also addressed to Mayor Jeffrey Dalin, the record is unclear if a copy

was hand-delivered to him as well.

Before the Corruption Complaint was delivered to Drake and the City Council members,

some of the signatories to the Corruption Complaint had discussed the allegations contained in

the Corruption Complaint with other individuals.  Jansen and Schuetz, on separate occasions,

discussed the allegations with Catherine Small, a citizen of Cornelius and a member of the

Community-Oriented Policing Committee Advisory Board (COPCAB).  Small Depo. (Ex. 109 to

Jan. 23, 2015 Franz Decl.) at 8-12, 14 (describing ride-along with Schuetz in April or May of

2012 during which he told her about corruption, deceit, and dishonesty in the police department);

Id. at 18-19, 30-31 (describing ride-along with Jansen in June or July 2012); Jansen Depo. (Ex.

107 to Jan. 23, 2015 Franz Decl. ) at 28, 60 (recalling telling Small during a ride-along about

unethical conduct and corruption in the department); see also Small Depo. at 31-32 (Ex. 109 to

Jan. 23, 2015 Franz Depo.) (describing ride-along with Monico in which he called Rubenstein a

dirty cop and told Small not to trust him).

Additionally, Schuetz, Jansen, and Watts shared allegations contained in the Corruption

Complaint with Washington County District Attorney Robert Hermann and Chief Deputy

District Attorney Roger Hanlon before delivering the Corruption Complaint to Drake and the

City Council members on October 17, 2012.  Hanlon Depo. (Ex. 110 to Jan. 23, 2015 Franz

Decl.) at 40-41; Schuetz Depo. (Ex. 111 to Jan. 23, 2015 Franz Decl.) at 10-11.  Schuetz and

Watts met with Hermann in May, June, or July 2012 about their concerns in the police

department.  Schuetz Depo. (Ex. 111 to Jan. 23, 2015 Franz Decl.) at 10-11.  Watts also met with

Hanlon and left Hanlon with a packet of materials that contained a draft of an ethics complaint to

the Department of Public Safety Standards and Training (DPSST).  Hanlon Depo. (Ex. 110 to

Jan. 23, 2015 Franz Decl.) at 40-41; Ex. 102 at 2-9.  Jansen drafted a memorandum containing

allegations of corruption which he sent to Hanlon in August 2012.  Hanlon Depo. (Ex. 110 to

Jan. 23, 2015 Franz Decl.) at 41; Ex. 102 at 10-14.

After receiving the Corruption Complaint on October 17, 2012, Drake showed it to

Debbie Roth in the City Recorder's Office who read it and then made a copy and sent it to City

Attorney Chad Jacobs.  Drake Depo. (Ex. 114 to Jan. 23, 2015 Franz Decl.) at 18.  Based on

advice he received from Jacobs, Drake concluded that the Corruption Complaint was a public

document.  Id. at 30.

In responses to interrogatories, Defendants state that because the Corruption Complaint

was addressed "to other people," had been distributed "to other people," and included statements

that "we write to you now to inform you and the public," and that "[w]e . . . believe that the City

Council will act based on the information we are reporting to the City and to the citizens of

Cornelius," Drake concluded the Corruption Complaint was a public document intended to

inform the public and Cornelius citizens of the allegations contained therein.  Ex. 105 to Franz

Decl. (Defs.' Resp. to Interr. No. 1).  Additionally, the Corruption Complaint did not request that

it be kept confidential.  Ex. 101A to Franz Decl.

Drake showed the Corruption Complaint to Rubenstein after showing it to Roth.  Drake

4 - OPINION & ORDER

Depo. (Ex. 4 to Thenell Decl.) at 19.  He also, at some point, gave copies to Noffsinger and Brian Schmid, id. at 25, 27, as well as to Dustin DeHaven.  DeHaven Depo. (Ex. 6 to Thenell Decl.) at 32.  The Corruption Complaint contained allegations of misconduct by DeHaven.  Ex. 101A to Jan. 23, 2015 Franz Decl.

On October 18, 2012, the day after receiving the Corruption Complaint, Drake sent an email to the following individuals:  Brian Schmid, Bruce Schmid, Craig Wellhouser, Doug Schuetz, Dustin DeHaven, Jason Moser, Joe Noffsinger, John Calvert, Jon Kirkpatrick, Laura Chrisy, Mark Jansen, Miguel Monico, Paul Rubenstein, Marlene Thomas, and Watts.  Ex. 103 to Franz Jan. 23, 2015 Decl.  These are apparently all of the individuals who were working for the City of Cornelius Police Department at the time.  Drake Depo. (Ex. 114 to Jan. 23, 2015 Franz Decl.) at 34 (Drake recalled that he sent the email to "[t]he entire police department").

In his email, addressed to Watts, Drake thanked Watts for delivering the Corruption Complaint and assured Watts that the matter would be taken seriously and fully investigated.  Id. He noted that the City's law firm would retain the "Local Government Personnel Institute" (LGPI) to investigate the allegations.  Ex. 103 to Franz Jan. 23, 2015 Decl.  He explained that because the District Attorney's Office had already completed the investigation previously requested by Watts and uncovered "nothing criminal," the City would not be placing Rubenstein or Noffsinger on paid administrative leave as the Corruption Complaint had requested.  Id. Drake stated that the City could not comment further on the substance of the Corruption Complaint until the investigation was complete.  Id.

After Drake and City Council members received the Corruption Complaint, Watts gave the Corruption Complaint to Forest Grove Chief of Police Janie Schutz and, during the meeting

in which Watts delivered the document to her, Watts indicated that the Corruption Complaint was going to be released to the media. Schutz Depo. (Ex. 115 to Jan. 23, 2015 Franz Decl.) at 5, 6, 14; S. Watts Depo. (Ex. 106 to Jan. 23, 2015 Franz Decl.) at 54. One of the signatories to the Corruption Complaint, Jansen, indicated that after the Corruption Complaint was given to the City, Monico contacted the West Bureau desk of the Oregonian about the Corruption Complaint. Jansen Depo. (Ex. 107 to Jan. 23, 2015 Franz Decl.) at 49-50; see also Monico Depo. (Ex. 108 to Jan. 23, 2015 Franz. Decl.) at 5, 16 (admitting he contacted the Oregonian and believing that it was before the November 2012 story appeared in that newspaper).

Other members of the City of Cornelius community received copies of the Corruption Complaint from signatories to that Complaint. E.g., Jansen Depo. (Ex. 107 to Jan. 23, 2015 Franz Decl.) at 18 (Jansen gave a copy to Greg Harper, a member of the COPCAB); Small Depo. (Ex. 109 to Jan. 23, 2015 Franz Decl.) at 14, 15 (Harper gave a copy to Small, another COPCAB member); see also id. at 13-14 (stating that a week or a week and one-half before October 16, 2012, Harper told Small that the Corruption Complaint was forthcoming).

On October 19, 2012, the following persons met at Small's house to discuss the Corruption Complaint: Watts, Jansen, Gerry Thompson, Billie Crowder, Harper, Small, Watts's wife Lisa, and Schuetz. Id. at 18. Following the meeting, Small set up a meeting with Drake for Monday, October 22, 2012. Id. at 20. On that date, Small, Thompson, Crowder, and Lisa Watts met with Drake and Roth. Id. at 21, 22.

In early November 2012, the City gave the Oregonian a copy of the Corruption Complaint in response to the newspaper's public records request. Drake Depo. (Ex. 114 to Jan. 23, 2015 Franz Decl.) at 33; Ex. 105 at 6. Both Plaintiffs knew that the Corruption Complaint was given

to the Oregonian in early November 2012.  Monico Depo. (Ex. 108 to Jan. 23, 2015 Franz Decl.)

at 5; S. Watts Depo. (Ex. 106 to Jan. 23, 2015 Franz Decl.) at 65.  Jansen, one of the signatories

of the Corruption Complaint, wanted the Oregonian to "put pressure on the public officials who

appeared to be covering up the matter" although he did not necessarily want the Oregonian to

have the Corruption Complaint.  Jansen Depo. (Ex. 107 to Jan. 23, 2015 Franz Decl.) at 50-51.

Drake also gave a copy of the Corruption Complaint to the Forest Grove News-Times.  Drake

Depo. (Ex. 114 to Jan. 23, 2015 Franz Decl.) at 33.  The Oregonian published a story about the

Corruption Complaint on November 6, 2012.  Plfs.' Ex. 10.

On or about November 13, 2012, Summers was hired as the interim chief of the police

department.  Summers Depo. (Ex. 17 to Thenell Decl.) at 11.  Eventually he was hired

permanently.  About a month or two after he was hired, Summers began posting what he referred

to as "inspirational" posters in the men's restroom.  Id. at 124.  Copies of some of them can be

found in Exhibit 19 to Thenell's Declaration.  One of them is a message from Mother Teresa.  Ex.

19 to Thenell Decl. at 1.  Another appears to suggest how to be "successful as followers" and

includes messages such as "[d]o not second-guess decisions made by their chain of command"

and "[d]o not tolerate other employees second-guessing the chain-of-command."  Id. at 4, 5.

Another is a quote attributed to Henry  regarding a "band of brothers," underneath which was

added a message that those at the police department in Cornelius are a band of brothers.  Id. at 6.

Finally, another simply stated: "Question: Are you holding us back or Leading the charge to

greatness?" while one addressing loyalty provided: "LOYALTY[-] Using difficult times to

demonstrate my commitment to those I serve, and those I serve alongside."  Id. at 7, 8.

In deposition, DeHaven called these "little motivational posters" that Summers put up.

7 - OPINION & ORDER

(Ex. 6 to Thenell Decl.) at 49.  DeHaven stated that some people, including himself, got a little annoyed at them, and specifically mentioned the one about "loyalty."  Id. at 50.  He noted that while the posters were "meant for good," and "meant to make you think," "just because of what we were going through, that it struck a chord with people and frustrated them."  Id.  DeHaven understood another as implying that the four members of the department who wrote the Corruption Complaint were "holding the department back from making it a good department." Id. at 50-51 (referring to Ex. 19 to Thenell's Decl. at 7).

DeHaven also testified that at some unspecified point in time, he had a conversation with Summers about a complaint filed by DeHaven concerning an alleged hostile work environment which included allegations against Watts.  Id. at 47.  According to DeHaven, when Summers read the complaint, Summers was "astounded" by what it contained and noted that "maybe . . . part of what was going on" and "perhaps the reason why Shawn [Watts] is making some of these decisions . . . was maybe because he had a learning disability."  Id.

The next year, on July 26, 2013, Summers sent an email to all members of the police department regarding schedule changes.  Ex. 18 to Thenell Decl. at 3-4.  As a result of studying activity levels, he made changes to supervisory schedules.  Id.  He also solicited feedback, but noted that any opinions needed to be "voiced in a constructive, positive manner."  Id. at 4.  In response, Monico wrote a long email to Summers which was critical of the decision and the "study."  Id. at 1-3.  He accused Summers of failing to review activity reports compiled by Watts. Id.  He also referred to suffering morale as a result of the "blasted incessant hostile message propaganda in the REST room that does more to divide and harm than motivate and unify."  Id. at 2.  He asked what the purpose was, who was putting the posters up, and why.  Id.  He stated

that he "and many others" found them "hostile, offensive and divisive." Id.  At the end of the

email, he offered to sit down with Summers to "[i]dentify a more comprehensive patrol

supervision matrix that has as little to no adverse impact to our CPOA members and maximizes

patrol efficiency for our esteemed community." Id. at 3.

In response, Summers responded to Monico in an email which he copied to Watts,

Jansen, and Schuetz. Id. at 1.  Summers wrote:

> Miguel, while I do not personally demand respect, recognizing that it must first be
> earned, I do demand that every officer on this agency respect the chain of
> command and respect for our system.  I find your email offensive and
> disrespectful on all counts.  [I] have no idea what you are referring to in your
> references to El Centro, nor do I understand why you find the motivational posters
> so offensive.  I can only guess that they have touched a nerve and you mistakenly
> believe that they are directed to you.
> If you have insight [I] would suggest that you take advantage of my offer and stop
> in anytime to converse face to face on these issues like everyone else does.
> It is clear that you are far afield from the mainstream of our organization.
> Nevertheless, I still respect and seek your input[.] I look forward to continuing
> this conversation one on one.

Id.

Sometime in 2013, a lieutenant position in the police department became open. See Ex. 2

to Thenell Decl. (Watts's Resp. to Interrog. No. 9).  Watts raised concerns to Summers about the

City's nepotism policy and the lieutenant process. Id.; see also Summers Depo. (Ex. 17 to

Thenell Decl.) at 135 (discussing formal nepotism complaint made from Watts and Officer John

Calvert).  According to Watts, Summers said he would halt the lieutenant testing process and

would re-word the testing qualifications. Ex. 2 to Thenell Decl.  Watts expressed that he would

submit a letter of interest after the qualifications were reworked and relisted. Id.  Watts states

that the relisting did not occur and on September 25, 2013, Summers announced the

9 - OPINION & ORDER

promotion/appointment of Bruce Schmid to the position. <u>Id.</u>; <u>see also</u> Summers Depo. (Ex. 17 to Thenell Decl.) at 135 (stating that he sustained the nepotism complaint but still made Bruce Schmid a permanent lieutenant from an acting lieutenant). Summers testified in deposition that even if Watts had applied, he would not have considered him for the position for several reasons, including that he thought Watts was a poor leader. Summers Depo. (Ex. 17 to Thenell Decl.) at 96.[3]

In separate civil litigation, Monico was a defendant in a federal civil rights action which was filed in March 2011. On April 10, 2013, Judge Papak issued a thirty-three page Findings & Recommendation (F&R) where, in pertinent part, he found that a "finder of fact could reasonably determine Gonzalez did not confess in the manner testified to by Monica [sic] under oath, and that Monica [sic] entirely fabricated his account of Gonzalez' confession." Plfs.' Ex. 20 at 22. Judge Papak also noted that a finder of fact could reasonably conclude that the first of two field tests described by Monico's testimony never took place. <u>Id.</u> at 21 n.6.

On April 17, 2013, Summers emailed a copy of the F&R to Hanlon and City Attorney Jacobs. Plfs.' Ex. 21. Summers requested that Hanlon review the ruling, noting in particular footnote 6 on page 21. <u>Id.</u> He asked Hanlon to contact him after he had reviewed it with "Bob" (presumably referring to District Attorney Hermann), and indicated that Summers would then share Hanlon's and Hermann's opinion with City Attorney Jacobs. <u>Id.</u> Summers assured Hanlon that "we will take all appropriate action to rectify this situation." <u>Id.</u>

On April 18, 2013, Summers received a letter back from Hermann, via email. <u>Id.</u> The

---

[3] These facts regarding the lieutenant position are recited in the background section of Plaintiffs' Response Memorandum, but are not raised by Plaintiffs in the argument section and are not contended to be an act of retaliation. Plfs.' Resp. Mem. at 5-6, 10-11.

letter noted that the findings were at summary judgment so further litigation on the issue may or may not occur. Plfs.' Ex. 22. Nonetheless, given the findings, Hermann stated that his office had to consider Monico to be a "Brady List" witness immediately, triggering the District Attorney's requirement that defendants with pending matters in which Monico was a witness be notified of the F&R. Id. Hermann further stated that the obligation also applied to any new matters in which Monico was a witness and finally, that the attorneys in the District Attorney's Office would begin case specific reviews to further assess Monico's involvement in those cases. Id. Hermann asked that Summers provide notice of the letter to Monico. Id.

Summers placed Monico on administrative leave. Summers asked Noffsinger and Bruce Schmid, of the police department's Professional Standards Unit, to retrieve Monico's badge and gun. Schmid Depo. (Ex. 5 to Thenell Decl.) at 48-49. Monico was at home at the time. Id. His family may or may not have been there. Id. at 51 (stating that someone closed the garage door which had been open when they arrived, but Schmid did not know who it was: "I don't know if it was his wife or daughter -- some people came out, saw us, closed the garage door."). After arriving, Schmid and Noffsinger waited and eventually were told to leave because an agreement had been reached where Monico could keep "his stuff" but could not act in any official capacity. Id. at 51.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

11 - OPINION & ORDER

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

DISCUSSION

As noted above, each Plaintiff brings three claims: (1) a First Amendment claim under 42 U.S.C. § 1983; (2) a violation of Oregon's whistleblowing statute, Oregon Revised Statute § (O.R.S.) 659A.218; and (3) common law IIED claims.

/ / /

12 - OPINION & ORDER

I. First Amendment Claims

In the Complaint, Plaintiffs allege that they expressed a matter of public concern in the Corruption Complaint and acted outside of their formal police officer duties when doing so. Compl. at ¶¶ 26, 38. They allege that the reckless and intentional dissemination of the Corruption Complaint to other City of Cornelius employees and to the Oregonian was done to punish and retaliate against them. Id. at ¶¶ 27, 39. Plaintiffs contend that the disclosures were done as a "means to deprive" them of their protected First Amendment speech rights. Id.

Additionally, Monico alleges that Summers's "premature" disclosure of Judge Papak's F&R to the District Attorney's Office further violated his First Amendment rights. Id. at ¶ 40. Monico contends that Summers prematurely disclosed the F&R in order to punish Monico for his involvement with the Corruption Complaint and that this action caused Monico to be placed on administrative leave and on Washington County's Brady List. Id.

Defendants[4] move for summary judgment on the First Amendment claims contending that Plaintiffs' Corruption Complaint was part of their duties as police officers and thus is not protected speech. Alternatively, they argue that there was no "retaliation by dissemination," meaning that because Plaintiffs themselves already distributed the Corruption Complaint or discussed its allegations with others, intended to inform the public of the allegations, and made no request that the Corruption Complaint be confidential, Drake's disseminating the Corruption Complaint cannot be described as retaliatory. Additionally, Defendants argue that Monico's allegations based on the F&R cannot support a First Amendment claim because the F&R was a

---

[4] Although it is not entirely clear from the Complaint, the only Defendants to the First Amendment claims are Drake and Summers. While the City is a named Defendant in the action, there are no allegations of municipal liability for the alleged constitutional deprivations.

public document and in any event, the Washington County District Attorney, not Summers, made the decision about the Brady List. Finally, Defendants argue that they are entitled to qualified immunity.

In order to establish a First Amendment retaliation claim, Plaintiffs must show "(1) that [they] engaged in protected speech; (2) that the employer took adverse employment action; and (3) that [their] speech was a substantial or motivating factor for the adverse employment action." Cotszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003) (internal quotation marks omitted).

A. Constitutionally Protected Conduct

The Supreme Court made clear in Garcetti v. Ceballos that a public employee who speaks on a matter of public concern as part of his or her duties cannot recover for retaliation based on the matter disclosed. 547 U.S. 410 (2006). The Court, acknowledging that public employees "do not surrender all their First Amendment rights by reason of their employment[,]" nonetheless held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 417, 421.

To support their position that there is no First Amendment protection for Plaintiffs, Defendants rely on deposition testimony from each Plaintiff stating that he prepared, participated in, or signed the Corruption Complaint as a City of Cornelius police officer. Defendants argue that because Plaintiffs concede they were acting as police officers, they spoke pursuant to their official duties and thus, cannot base their First Amendment claims on the Corruption Complaint. Watts Depo. (Ex. 106 to Jan. 23, 2015 Franz Decl.) at 51 (stating that he participated in the

Corruption Complaint as a police officer employed by the City of Cornelius); Monico Depo. (Ex. 108 to Jan. 23, 2015 Franz Decl.) at 16-17 (stating that he signed the Corruption Complaint as part of his duties as a police officer for the City of Cornelius).

In Garcetti, the plaintiff was a deputy district attorney for Los Angeles County, assigned as a "calendar deputy" during the relevant time period. Id. at 413. A defense attorney contacted the plaintiff and asked him to investigate inaccuracies in a critical police affidavit. Id. The plaintiff reported to his supervisor that the affidavit contained serious misrepresentations. Id. He followed up by preparing a disposition memorandum and an additional memorandum to his supervisor. Id. The supervisor proceeded with the prosecution despite the plaintiff's findings. Id. The plaintiff brought a First Amendment retaliation claim based on adverse employment actions taken against him after these events. Id.

The Court noted that "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy" and importantly, "the parties . . . do not dispute that Ceballos wrote his disposition memo pursuant to his employment duties." Id. at 421, 424. Thus, the Court had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." Id.

The Court nonetheless made several observations to guide courts going forward. It stated that it was not dispositive that the plaintiff had made his views inside his office rather than publicly because employees in some cases may receive First Amendment protection for expressions made at work. Id. at 420. It was also not dispositive that the memorandum the plaintiff wrote concerned the subject matter of his employment because the First Amendment protects some expressions related to the speaker's job. Id. at 421. The Court also rejected the

15 - OPINION & ORDER

idea that formal job descriptions controlled the determination of whether the speaker's expression was made pursuant to official duties. Id. at 424-25.

In a 2013 en banc Ninth Circuit decision, the court addressed whether statements by a police detective which disclosed alleged use of abusive interrogation tactics by other officers were made pursuant to the detective's official duties. Dahlia v. Rodriguez, 735 F.3d 1060 (9th Cir. 2013), cert. denied, 134 S. Ct. 1283 (2014). The district court and the Ninth Circuit panel both relied on a 2009 Ninth Circuit case to conclude that the detective in Dahlia had acted pursuant to his police officer duties. Id. at 1063, 1071 (discussing the district court and panel holdings based on Huppert v. City of Pittsburgh, 574 F.3d 696 (9th Cir. 2009)). The Dahlia en banc court noted that although Huppert was decided after Garcetti, the Huppert court relied on an older California case to conclude that as a matter of law, an officer acted pursuant to his official duties in cooperating with the FBI and testifying before a grand jury. Dahlia, 735 F.3d at 1070 (citing Huppert, 574 F.3d at 706-10).

The en banc Dahlia court concluded that Huppert erred by relying on the earlier California case's "sweeping description of a California police officer's professional duties," and had failed to follow Garcetti's "mandate that 'the proper inquiry to determine the scope of an employee's professional duties is a practical one.'" Id. (quoting Garcetti, 547 U.S. at 424) (brackets omitted). The en banc Dahlia court then expressly overruled Huppert "to the extent that it improperly relied on a generic job description and failed to conduct the 'practical,' fact-specific inquiry required by Garcetti." Id. at 1071.

In considering the Dahlia plaintiff's claims, the en banc court noted that the Ninth Circuit had previously held that "after Garcetti the inquiry into the protected status of speech presents a

mixed question of fact and law, and specifically that the question of the scope and content of a

plaintiff's job responsibilities is a question of fact." Id. at 1072 (internal quotation marks

omitted). The en banc Dahlia court also discussed a 2006 case where the Ninth Circuit held that

a correctional officer acted pursuant to her official duties when she made internal reports of

inmate sexual misconduct and documentation of the prison's failure to respond, but acted as a

citizen when she made the same complaints in a letter to a state senator and state inspector

general. Id. at 1073 (discussing Freitag v. Ayers, 468 F.3d 528, 545-46 (9th Cir. 2006)). In

Freitag, the Ninth Circuit remanded to the district court the "closer question" whether the

correctional officer acted pursuant to her official duties when she sent a letter with the same

concerns to the director of the state prison system because the court was "unsure whether prison

guards are expected to air complaints regarding the conditions in their prisons all the way to" the

director of the state system. Freitag, 468 F.3d at 546.

    In Dahlia, the court noted that because of "the fact-intensive nature of the inquiry" it

could not offer a "single formulation of factors" to be used to "determine the scope of a plaintiff's

job duties." 735 F.3d at 1074. It still noted, however, a "few guiding principles[.]" Id.[5] First,

the court noted that in a "highly hierarchical employment setting such as law enforcement,

whether or not the employee confined his communications to his chain of command is a relevant,

if not necessarily dispositive, factor in determining whether he spoke pursuant to his official

duties." Id. Communications to individuals or entities outside the chain of command make it

unlikely that the employee is speaking pursuant to his official duties. Id. In contrast, when a

---

[5] In a footnote, the court also noted lists of factors found by other circuits to be relevant
to the inquiry. 735 F.3d at 1074 n.13.

public employee raises complaints up the chain of command about his workplace, that speech is

typically undertaken in the course of performing his or her job.  Id.  If the public employee takes

his or her concerns outside the workplace in addition to raising them up the chain of command

within the workplace, the "external communications are ordinarily not made as an employee, but

as a citizen."  Id. (internal quotation marks omitted).

Second, the "subject matter of the communication" is "highly relevant to the ultimate

determination whether the speech is protected by the First Amendment."  Id. at 1074-75.

Preparation of a routine report pursuant to normal departmental procedure about a particular

incident or occurrence is typically within the employee's job duties.  Id. at 1075.  In contrast, if a

public employee raises

> within the department broad concerns about corruption or systemic abuse, it is
> unlikely that such complaints can reasonably be classified as being within the job
> duties of an average public employee, except when the employee's regular job
> duties involve investigating such conduct, e.g. when the employee works for
> Internal Affairs or another such watchdog unit.

Id.  Third, the court noted that when a "public employee speaks in direct contravention to his

supervisor's orders, that speech may fall outside the speaker's professional duties."  Id.

Contrary to Defendants' argument, the fact that the Plaintiffs each testified in deposition

that they participated in and signed the Corruption Complaint as part of their duties as City of

Cornelius police officers is not dispositive of the issue.  Their testimony is directed to the

ultimate conclusion but it omits any relevant facts.  Moreover, the summary judgment record is

lacking in relevant evidence.  There are no job descriptions.  There is no indication of whether

the City Manager (Drake), the Mayor, or the City Council Members, all of whom were

addressees of the Corruption Complaint, are part of the "chain of command" above the police

18 - OPINION & ORDER

chief.  The "chain of command" factor is highly relevant.  When the public employee's complaint

attacks the conduct of the assistant chief and the chief, the next person up the line may well be

the city manager, mayor, or city council.  It could be that these persons are properly considered to

be inside the chain of command in this situation.  Or, they could be outside the chain of

command.  Without some sort of organizational chart, City bylaws, or testimony on the issue, the

record fails to include facts material to the inquiry.  In their Response Memorandum, Plaintiffs

state that they were not employed by the City to investigate and report corruption or misconduct,

but they offer no evidence to support that assertion.

Construing the facts in favor of Plaintiffs, the nonmoving parties, I assume that the

addressees of the Corruption Complaint were outside the police department's chain of command.

Given the subject matter of the letter, when looking at the evidence in a light most favorable to

Plaintiffs, there are factual issues regarding whether Plaintiffs made the Corruption Complaint

pursuant to their official duties.[6]

B.  Retaliation/Adverse Action - Merits

"On summary judgment in a First Amendment retaliation case, a plaintiff must provide

evidence of materially adverse employment actions that are reasonably likely to deter protected

---

[6] I reject Defendants' argument made in their Reply Memorandum that Plaintiffs cannot
bring their statutory whistleblower claims in which they allege they were employees, and at the
same time argue that they were outside the scope of their job duties when they made the
Corruption Complaint.  Although the whistleblower claim does require that the plaintiff be an
employee, the First Amendment claim does not prohibit claims by employees.  In fact, it assumes
the plaintiff is an employee which is why there is an inquiry into the scope of the employee's
duties and a determination of whether the employee engaged in the speech pursuant to his or her
official duties.  Employee status alone is not inconsistent with a First Amendment claim.

speech." Thomas v. County of Riverside, 763 F.3d 1167, 1168 (9th Cir. 2014) (internal

quotation marks omitted), amended on denial of r'hrg en banc, 776 F.3d 1020 (9th. Cir. 2015).

Adverse employment actions may be "so trivial as to be legally insufficient[.]" Id. at 1169

(internal quotation marks omitted).  However, because the test is whether the adverse

employment actions are reasonably likely to deter protected speech, even actions which might

seem minor can, depending on the context, constitute adverse employment actions in a First

Amendment retaliation claim.  Id.; see also Dahlia, 735 f.3d at 1078 ("in First Amendment

retaliation cases, the goal is to prevent, or redress, actions by a government employer that chill

the exercise of protected First Amendment rights") (internal quotation marks and brackets

omitted).

In the allegations asserted in support of their First Amendment claims, Plaintiffs identify

only the dissemination of the Corruption Complaint by Drake and the F&R by Summers as the

alleged retaliatory adverse actions.  Compl. at ¶¶ 25-29, 37-42.  In their Response Memorandum,

Plaintiffs rely on additional alleged retaliatory conduct.  I address the dissemination allegations

first, then turn to the additional conduct.

    1.  Dissemination

        a.  The Corruption Complaint

Defendants contend "there was no retaliation" and that the argument that Plaintiffs were

retaliated against when Drake disseminated the Corruption Complaint is "baseless."  Defs.' Mem.

at 22.  Defendants note the following in support of their argument:  (1) various purposes of the

Corruption Complaint were to (a) inform the City Manager and City Council members, as well as

the public, of the allegations; (b) let the City Manager, Mayor, and City Council know that the information in the Corruption Complaint had already been given to the Oregon Department of Justice and the Washington County District Attorney's Office; (c) inform the City Manager, Mayor, and City Council that a criminal investigation was underway targeting the reported cover-up of alleged misconduct or criminal conduct committed by then-Chief of Police Rubenstein; (d) ask the City Manager, Mayor, and City Council to review a four-page memo that had been delivered to Washington County Chief Deputy District Attorney Roger Hanlon; (e) let the City Manager, Mayor, and City Council know that in May 2012, Watts had contacted the Oregon Department of Justice; (f) let the City Manager, Mayor, and City Council know that an outside law enforcement agency had begun an investigation into the information provided by the Forest Grove Officer; and (g) let the City Manager, Mayor, and City Council know that the authors of the Corruption Complaint were reporting the information contained in the letter to the citizens of Cornelius;

(2) the Corruption Complaint itself placed no prohibition or restrictions on its dissemination and there was no request that it be kept confidential or no assertion that it was not a public record; additionally, the officers could not reasonably request that the letter remain confidential after outlining in the letter all of the agencies that had already been contacted and supplied with the information in the letter;

(3) the Corruption Complaint was sent to elected officials of the City who have no supervisory duties over Plaintiffs and who had no authority or justification to keep the letter from anyone who made a request for a copy of it, including the Oregonian, which had been alerted

already by Monico;

(4) other officers already knew of the contents of the Corruption Complaint and who signed it, including Officer Jason Moser who initially participated in drafting the Corruption Complaint but did not sign it; and

(5) Plaintiffs, Jansen, and Schuetz gave copies of the Corruption Complaint to members of the public and discussed the Corruption Complaint in meetings with others without requiring the contents to remain confidential.

Based on these reasons, Defendants assert that the Corruption Complaint was a public record available to anyone who requested it and anyone who had a copy of it could give it to anyone else. They argue that the Corruption Complaint was not protected under any state or federal law or any type of privilege. They contend that as a matter of law, none of the Defendants can be held liable under the First Amendment for any dissemination of the Corruption Complaint to anyone, including the Oregonian.

Adapting Defendants' argument to the language used in First Amendment retaliation claims in the employment context, Defendants rely on the undisputed evidence that members of the community already knew about the allegations, and some had even learned of the allegations from at least one of the Plaintiffs, to contend that Drake's conduct was not adverse. Given that members of the community already knew about the allegations and that the Corruption Complaint itself made clear that Plaintiffs intended to inform the public about the allegations, Defendants argue that dissemination of the Corruption Complaint cannot, as a matter of law, be reasonably viewed as an action that was likely to deter or chill protected speech. Thus, whether it

is called an "adverse employment action" or "retaliation," Defendants' contention is that because Plaintiffs intended the document to become public and to address issues of public concern, because they did not request that it be treated confidentially, and most importantly, because they themselves discussed the allegations contained in the Corruption Complaint and the actual Corruption Complaint with community members, Drake's dissemination of the Complaint to Rubenstein and Noffsinger and others cannot be said to have been in retaliation for protected speech or to be an action that was likely to deter protected speech.[7]

At oral argument, Plaintiffs' counsel confirmed that disseminating the Corruption Complaint was one of the adverse actions taken against Plaintiffs. Although he recognized that the allegations in the Corruption Complaint would have to be disclosed to allow the requested investigation to occur, Plaintiffs' counsel contended that disclosure to Noffsinger and Rubenstein, the individuals who were alleged to be corrupt, as well as disclosure to the fellow officers in the police department, was problematic. He further suggested that it was an issue of timing, meaning that while disclosure may have been inevitable, it did not need to occur immediately.

As I interpret Plaintiffs' argument, Plaintiffs do not contend that Drake was prohibited

---

[7] In their Reply, Defendants contend that Noffsinger and Rubenstein had the constitutional due process right to know the contents of the Corruption Complaint and the identities of those making allegations against them. They cite three cases in support, two of which involved the termination of a public employee and the third of which involved the termination of public assistance benefits. The cases note that the employee or benefit recipient has the right to procedural due process which includes the right to confront those making the allegations against them. But, in all of those cases, termination of the employee/benefit was proposed and in progress. Here, at the time that Drake gave Noffsinger and Rubenstein a copy of the Corruption Complaint, no investigation had yet begun as a result of the Corruption Complaint and no discipline/termination had yet been proposed against Noffsinger or Rubenstein. Thus, without more convincing authority, I reject the contention that any due process rights had yet accrued to Noffsinger or Rubenstein at the time Drake gave them the Corruption Complaint.

23 - OPINION & ORDER

from disseminating the Corruption Complaint generally, but instead, his conduct here is actionable because his otherwise permissible dissemination was motivated by his desire to punish Plaintiffs and retaliate against them.  I agree with Plaintiff that the law recognizes that an employer's otherwise permissible conduct may subject it to liability when such conduct occurs in retaliation for protected speech or other protected conduct.  Thus, for example, even though an employer may have the right to fire an employee at will, the employer cannot do so for the purpose of retaliating against an employee who engaged in protected conduct such as filing a sexual harassment complaint or a worker's compensation claim.

However, the facts of this case support Defendants' position.  Given the undisputed facts recited by Defendants which establish that Plaintiffs intended the Corruption Complaint to be publicized, had already shared the allegations with other members of the community, and made no request themselves that the document be kept confidential, they cannot show that dissemination of the Corruption Complaint was adverse to them in any way.  Moreover, given that they admit that dissemination of the Corruption Complaint generally (including to the Oregonian), and disclosure to Noffsinger and Rubenstein in particular, was inevitable, their retaliation argument hinges on the timing.  But, Plaintiffs fail to show that any actions were taken against them as a result of Drake's decision to disseminate the Corruption Complaint when he did.  Without evidence that they were harmed or hindered in any way as a result of Drake's distribution of the Corruption Complaint at that particular time, they fail to show that a person of "ordinary firmness" would be chilled in the exercise of his or her constitutional right of free speech.

24 - OPINION & ORDER

b.  Judge Papak's F&R

Defendants argue that sending Judge Papak's public opinion to the District Attorney's Office cannot be actionable as a matter of law.  They note that the F&R is a public record and is available to any member of the public.  Moreover, Defendants note that it was the District Attorney's Office, not Summers, that placed Monico on the Brady List.

I agree with Defendants.  The F&R was a public document, filed in a public record.  Plaintiffs cannot plausibly argue that Summers was prohibited from providing the District Attorney's Office with a copy of the F&R.  Plaintiffs again focus on timing by repeatedly referring to Summers's action as "premature."  But, they fail to show that the timing of Summers's forwarding the document to the District Attorney's Office caused any harm to Monico.  I focus here on Summers's act of distributing the F&R to the District Attorney's Office.  His placement of Monico on administrative leave is addressed separately below.  While the response by the District Attorney's Office to the F&R suggests that it considered Monico to be a "Brady List" witness, this was, as Defendants note, an action by the District Attorney's Office, not Summers.  Summers, not the District Attorney's Office, is the Defendant here and only his actions are at issue.  Additionally, because the District Attorney's Office was not his employer, this was not an adverse "employment" action.  And, given that the District Attorney's Office was inevitably going to learn of the F&R at some point, any harm must be attributable to when Summers gave the document to the District Attorney's Office.  There is no evidence in the record demonstrating that adverse action occurred because of the timing.

Even if placement on the Brady List can be attributed to Summers's having sent a copy of

25 - OPINION & ORDER

the F&R to the District Attorney's Office when he did, Monico fails to establish how placement

on the Brady List was adverse to him.  As Hermann testified in deposition, the District Attorney's

Office has "never refused a case from [Monico]" and it "actively prosecut[es] his cases."

Hermann Depo. (Ex. 123 to Feb. 27, 2015 Franz Decl.) at 14.  The action taken by the District

Attorney's Office has been limited to notifying those defendants with pending matters in which

Monico is a witness, of the F&R.  Plfs.' Ex. 22; Hermann Depo. (Ex. 123 to Feb. 27, 2015 Franz

Decl.) at 14.  Monico fails to show how this notification has negatively affected him.  As a result,

without any evidence that he suffered harm in some way, he fails to show that Summers's

provision of the F&R to the District Attorney's Office in April 2013 was reasonably likely to

deter protected speech.  The allegation that Summers violated Monico's First Amendment rights

by forwarding a copy of the F&R to the District Attorney's Office does not support a claim.

### 2. Other Alleged Retaliatory Conduct

In response to the summary judgment motion, Plaintiffs retreat from the allegations in the

Complaint suggesting that the retaliatory conduct is limited to disseminating the Corruption

Complaint and the F&R.  Instead, they contend that the following actions were taken against

them in response to their protected speech:  (1) Summers's "demeaning remarks about Plaintiff

Watts" to DeHaven; (2) Summers's "lashing out via email to Plaintiff Monico"; (3) Summers's

hanging of "inspirational posters"; (4) Summers's "premature" action of recommending to the

District Attorney's Office that Monico be placed on the Brady List; (5) Summers's authorizing

Schmid and Noffsinger to retrieve Monico's badge and gun at Monico's home; and (6) Summers's

placement of Monico on administrative leave.  Plfs.' Mem. at 10-11.  With no discussion of these

discrete acts, Plaintiffs simply argue that reasonable jurors could conclude that the actions were retaliatory in response to their protected speech.  Id.

None of these alleged actions were committed by Drake.  Thus, summary judgment is granted to him.  The only alleged retaliatory conduct taken against Watts alone is the statement by Summers to DeHaven when they were discussing DeHaven's hostile environment claim against Watts, that maybe Watts had a learning disability.  This is too trivial to be legally sufficient retaliation.  E.g., Hardage v. CBS Broad., Inc., 427 F.3d 1177, 1189 (9th Cir. 2005) ("snide remarks," threats, ostracism, supervisor's laughing, hostile stares, and increased criticism, and badmouthing an employee outside a job reference, do not constitute "adverse employment" actions in the retaliation context; such actions too trivial to deter reasonable employees from exercising their rights), amended on denial of r'hrg, 433 F.3d 672, 436 F.3d 1050 (9th Cir. 2006). Additionally, there is no evidence in the record that Watts was aware of the comment, making it incapable of chilling his future expression.  And, as to the allegation that Summers prematurely placed Monico on the Brady List, I reject this as actionable retaliatory conduct for the reasons explained in the previous section and for the additional reason that factually, there is no evidence to support the assertion that Summers made a "recommendation" to place Monico on the Brady List.

Remaining are three alleged retaliatory actions against Monico alone and one alleged retaliation action as to both Plaintiffs.   In regard to the alleged retaliation arising out of the retrieval of Monico's gun and badge at his home after placing him on administrative leave, the record shows that Summers sent Schmid and Noffsinger to take Monico's badge and gun because

he had been placed on administrative leave and he was not to take any action as a police officer. Schmid Depo. (Ex. 5 to Thenell Decl.) at 48-49.  When asked if Schmid thought it was a good idea to do this at Monico's home, Schmid noted that Monico was at his home, had been placed on administrative leave, and "[t]hey didn't want to bring him in.  Whether he was at home or brought in, the outcome still would have been the same." Id. at 49.  Later, in response to additional questions, Schmid noted that "they did that to Chief Rubenstein" and it should not have been any different as to Monico.  Id. at 52.  He indicated that "they" also took Rubenstein's badge and gun then gave him a ride home so, Schmid continued, "what would be the difference?"  Id.

Even construing the evidence in a light most favorable to Plaintiffs, this deposition testimony does not establish that retrieving an officer's gun and badge when placed on administrative leave is aberrant police department conduct.  It also does not establish that retrieving a gun and badge from an officer at his or her home had never occurred before.  The testimony shows only that Rubenstein's gun and badge were similarly taken and that, apparently, this did not occur at Rubenstein's home but instead, it occurred somewhere else and then he was driven home.  The fact that Monico called his attorney once Schmid and Noffsinger went to his home to retrieve the items and counsel worked out an arrangement allowing Monico to keep the badge and gun does not establish that sending Schmid and Noffsinger to retrieve the items was retaliatory.  The evidence shows that retrieving the badge and gun was consistent with being placed on administrative leave and is not independently actionable as separate retaliatory conduct.  Instead, it is a component of placing an officer on administrative leave.

Next, for the reasons explained above regarding Summers's alleged demeaning remark

about Watts, Summers's "lashing out" in an email to Monico is not adverse, retaliatory conduct which would reasonably deter someone from engaging in protected conduct.  Summers told Monico that he demanded respect for the chain of command and "our system," found his email offensive and disrespectful, and did not understand why Monico found the motivational posters so offensive.  Ex. 18 to Thenell Decl.  He also offered to engage in face to face conversation on "these issues."  Id.  Although he noted that Monico was "far afield from the mainstream of our organization[,]" he told Monico he still respected him and sought his input.  Id.  As Hardage and the cases it cites recognize, snide remarks, increased criticism, and threats are insufficient to establish retaliation.  See also Nunez v. City of L.A., 147 F.3d 867, 875 (9th Cir. 1998) (mere harsh words or threats are insufficient to constitute an actionable adverse employment action in First Amendment retaliation claim).

As to the remaining alleged actions of placing inspirational posters in the restroom and placing Monico on administrative leave, when considered in a light most favorable to Plaintiffs, I find that there are issues of fact as to whether these were sufficiently retaliatory as to deter a reasonable person from engaging in protected conduct.  The placement of inspirational posters is different in kind than the other instances of demeaning or hostile remarks made about or to Watts or Monico by Summers.  First, in contrast to an offhand comment or an email, the hanging of posters is more akin to officially sanctioned conduct by the department.  Second, the public placement of the posters creates a significantly greater chance of communicating hostility and divisiveness to the entire police department.  Even DeHaven acknowledged that at least one of the posters implied that the four members of the police department who signed the Corruption

29 - OPINION & ORDER

Complaint were "holding the department back[.]"  DeHaven Depo. (Ex. 6 to Thenell Decl.) at 51.

Construing the facts in a light most favorable to Plaintiff, a reasonable juror could conclude that

the posters contained thinly veiled criticisms of Plaintiffs.  And, third, while ostracism,

divisiveness, or hostility may not in many contexts rise above the trivial level, when the message

is prominently displayed in a public location in a law enforcement agency where teamwork is

often essential to protect the safety of officers and the public, Summers's hanging of the

inspirational posters could be viewed as an actionable adverse employment action because it

could reasonably deter a person from engaging in future protected conduct.

Finally, as Dahlia recognized, placement of a police officer on administrative leave may

constitute an adverse employment action in a First Amendment retaliation claim.  735 F.3d at

1078-79.  While the court did not hold that placement on administrative leave is, as a matter of

law, actionable retaliatory conduct, it explained that "Dahlia's assertions—that administrative

leave prevented him from taking the sergeant's exam, required him to forfeit on-call and holiday

pay, and prevented him from furthering his investigative experience—if proved, would constitute

an adverse employment action" because it was likely they would "deter employees from engaging

in protected activity.'"  Id. at 1079.

Although the record does not establish what consequences Monico experienced as a result

of being placed on administrative leave or for how long he remained on such leave, Dahlia

indicates that Monico may be able to establish facts to support his position that placement on

administrative leave was conduct reasonably likely to deter him from engaging in protected

activity.  Thus, summary judgment on this part of Monico's First Amendment claim is denied.[8]

    C.  Retaliation/Adverse Action - Qualified Immunity

    Although I agree with Defendants that Drake's dissemination of the Corruption Complaint and Summers's provision of the F&R to the District Attorney's Office is not retaliatory/adverse conduct sufficient to support Plaintiffs' First Amendment claims, in an abundance of caution I address Defendants' alternative qualified immunity argument on this issue.  "Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Chappell v. Mandeville, 706 F.3d 1052, 1056 (9th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

    Analysis of a qualified immunity claim requires the court to determine whether, taking the facts in the light most favorable to the party asserting injury, the alleged conduct violated a constitutional right and whether the right was clearly established at the time of the alleged violation.  Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2080 (2011).  Additionally, even if the right was clearly established at the time of the alleged violation, the defendant is entitled to qualified immunity if his mistake as to what the law requires is reasonable.  Brown v. Or. Dep't of Corr., 751 F.3d 983, 989 (9th Cir. 2014).

    In order to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v.

---

    [8]  Neither party discusses the issue of causation.  Although some alleged adverse actions survive summary judgment, Plaintiffs will still have to establish that their protected conduct motivated the actions against them.

Creighton, 483 U.S. 635, 640 (1987) ("in light of the pre-existing law the unlawfulness must be apparent"). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft, 131 S. Ct. at 2083.

Even assuming that Drake's dissemination of the Corruption Complaint to Noffsinger, Rubenstein, the Oregonian, and others, and Summers's provision of the F&R to the District Attorney's Office violated Plaintiffs' constitutional rights, Defendants are entitled to qualified immunity on this aspect of the First Amendment claims. My research has found no cases clearly establishing that (1) a non-employer's (2) disseminating to a third-party, (3) a document the contents of which had previously been publicized by its authors who also discussed its contents with members of the public, and (4) the authors of which clearly intended the document to become public (in fact conceding that it had to be disclosed), is retaliation in violation of the First Amendment. Similarly, my research has found no cases clearly establishing that a supervisor's provision of a publicly available judicial opinion to an attorney employed by a public agency is retaliatory conduct in violation of the First Amendment. Although the general relevant legal standard for First Amendment retaliation claims has been clearly established for some time, existing precedent has not placed the particular constitutional questions raised by the facts of this case, beyond debate. Finally, even if the law on this issue was clearly established, Drake and Summers are still entitled to qualified immunity because any mistake as to what the law requires in these circumstances was reasonable.

D.  Summary re: First Amendment Claims

In summary on the First Amendment claims, there are issues of fact as to whether

Plaintiffs' provision of the Corruption Complaint was part of their official duties. Nonetheless, I grant the summary judgment motion as to the claims against Drake because his act of disseminating the Corruption Complaint is not cognizable adverse/retaliatory employment action, or alternatively, he is entitled to qualified immunity for his actions. I also grant summary judgment to Summers as to the act of providing the F&R to the District Attorney's Office because that is also not cognizable adverse/retaliatory employment action, or alternatively, he is entitled to qualified immunity on that part of the claim. I further grant summary judgment to Summers as to all other alleged acts of retaliation except for the hanging of the inspirational posters and the placement of Monico on administrative leave. When the facts are construed in Plaintiffs' favor, these two actions could constitute unconstitutional retaliatory conduct. Furthermore, the law as to all alleged retaliatory conduct other than the dissemination of the Corruption Complaint and the F&R is clearly established and Summers is not entitled to qualified immunity for such conduct.

## II. Proper Defendant in Oregon Claims

Defendants argue that the only proper Defendant for the Oregon statutory whistleblower claims and the IIED claims is the City. Defendants, however, cite an outdated version of the Oregon statute in support of this argument. The former version of the relevant statute, O.R.S. 30.265(1), provided that for claims subject to the Oregon Tort Claims Act, O.R.S. 30.260 - 30.300 (OTCA), which include claims alleging a violation of Oregon whistleblowing statutes and IIED, see O.R.S 30.260(8) (defining a tort as the breach of a legal duty that is imposed by law, other than a contractually based duty), the sole cause of action for any tort of officers,

33 - OPINION & ORDER

employees, or agents acting within the scope of their employment duties and eligible for

representation and indemnification under the OTCA, is an action against the public body only.

However, the current version of the OTCA, effective on January 1, 2012, provides that a

tort action "may be brought and maintained against an officer . . . whether or not the public body

is also named as a defendant" if an action "alleges damages in an amount greater than the

damages allowed under . . . ORS 30.272[.]"  O.R.S. 30.265(4).  Pursuant to O.R.S. 30.272, the

liability of a local public body and its "officers, employees and agents acting within the scope of

their employment or duties" for personal injury claims "to any single claimant" arising out of "a

single accident or occurrence" is "$600,000 for causes of action arising on or after July 1, 2012,

and before July 1, 2013."  O.R.S. 30.272(2)(d).  The limitation on damages "to all claimants" for

such claims is "$1,200,000 for causes of action arising on or after July 1, 2012, and before July 1,

2013." O.R.S. 30.272(3)(d).

In their Complaint, Plaintiffs allege damages in the amount of $1,500,000.  Thus, they

contend that Drake and Summers are properly named Defendants in the case.  Defendants fail to

make any mention of this issue in their Reply Memorandum.  Because the current version of the

statute does not require that the City be substituted for the individual Defendants in this case with

$1.5 million in alleged damages, I reject Defendants' argument.

III.  Oregon Whistleblower Claims

Plaintiffs bring their whistleblower claims under O.R.S. 659A.218 which provides that

(1) The identity of the employee who discloses any of the following shall not be
disclosed by a public employer without the written consent of the employee
during any investigation of the information provided by the employee, relating to:

(a) Matters described in ORS 659A.203(1)(b).
(b) Reports required by ORS 659A.212(2).

(2) Violation of this section is an unlawful employment practice.

O.R.S. 659A.218.

Matters described in O.R.S. 659A.203(1)(b) include the employee's disclosure of any information the employee reasonably believes is evidence of (A) a violation of any federal or state law, rule, or regulation by the state, agency or political subdivision; or (B) mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health and safety resulting from action of the state agency or political subdivision.    O.R.S. 659A.203(1)(b). Because the Corruption Complaint could arguably fit under either (A) or (B), it is a matter described in O.R.S. 659A.203(1)(b) and thus, comes within the purview of O.R.S. 659A.218.

Defendants argue that the whistleblower claims are time barred.  Alternatively, Defendants contend that Plaintiffs waived the whistleblower claims by disclosing their names and the Corruption Complaint to several members of the public both before and after Drake disclosed the Corruption Complaint.  Because I agree with Defendants on the statute of limitations issue, I decline to address the waiver issue.

Drake disclosed the identity of the four officers who signed the Corruption Complaint on October 18, 2012.  Defs.' Ex. 103.  A copy of the Corruption Complaint was provided to the Oregonian before November 6, 2012, the date the Oregonian article discussing the Corruption Complaint was first published.  Plfs.' Ex. 10.  Both Plaintiffs were aware of the Oregonian article no later than November 9, 2012.  Watts Depo. (Ex. 106 to Franz Jan. 23, 2015 Decl.) at 65; Monico Depo. (Ex. 108 to Franz Jan. 23, 2015 Decl.) at 5.

Regardless of which disclosure date is used (the October 2012 date of the email or the November 2012 date of the <u>Oregonian</u> article), the December 2, 2013 lawsuit containing the whistleblower claim is beyond the one-year limitations period.  O.R.S. 659A.875(6).  Thus, the claims are time barred.  Plaintiffs argue that the "continuing tort" doctrine and the "discovery rule" apply here and toll the statute of limitations.

A.  Continuing Tort

Plaintiffs argue that a September 2013 story in the <u>Forest Grove News-Times</u> and a November 2013 follow-up story in the <u>Oregonian</u>, both of which named the four signatories to the Corruption Complaint, Exs. 11, 12 to Thenell Decl., are violations of the whistleblower statute which were within the one-year limitations period and thus, support a continuing violation theory.  I disagree.

The whistleblower statute makes it an unlawful employment practice to <u>disclose</u> the name of the employee without his or her written consent during any investigation of the information provided by the employee relating to the matters noted in O.R.S. 659A.203(1)(b).  O.R.S. 659A.218.  The conduct regulated is the actual disclosure, not what happens once the information is disclosed.

"The continuing tort doctrine applies to repeated instances or continuing acts of the same nature where there is no discrete act or incident that can be fairly determined to have caused the alleged harm."  <u>McLean v. Shelton</u>, No. 03:11-cv-01535-AC, 2013 WL 3994760, at *6 (D. Or. Aug. 2, 2013).  As explained by Judge Hubel in a 2014 decision, "Oregon courts have distinguished between a continuing course of conduct that involves discrete acts, each of which

would be actionable separately, and a series of acts constituting a continuing tort." Pearson v. Reynolds Sch. Dist. No. 7, 998 F. Supp. 2d 1004, 1027 (D. Or. 2014) (discussing Boardmaster Corp. v. Jackson Cnty., 224 Or. App. 533, 198 P.3d 454 (2008); Davis v. Bostick, 282 Or. 667, 580 P.2d 544 (1978); Griffin v. Tri-Met, 112 Or. App. 575, 831 P.2d 42 (1992), aff'd in part, rev'd in part on other grounds, 318 Or. 500, 870 P.2d 808 (1994)).  As Pearson noted, Oregon cases do not recognize "a series of discrete acts, even if connected in design or intent, as a continuing tort that would allow the statute of limitations to be avoided." Id. (internal quotation marks omitted).

The point of the continuing violation doctrine is to allow an action for the cumulative effects of a continuing system or pattern of conduct which occurs both inside and outside the limitations period.  See Douglas v. Cal. Dep't of Youth Auth., 271 F.3d 812, 822 (9th Cir.) ("The continuing violations doctrine extends the accrual of a claim if a continuing system of discrimination violates an individual's right up to a point in time that falls within the applicable limitations period.") (emphasis added) (internal quotation marks omitted), amended, 271 F.3d 910 (9th Cir. 2001).  "The doctrine applies where there is no single incident that can fairly or realistically be identified as the cause of significant harm." Flowers v. Carville, 310 F.3d 1118, 1126 (9th Cir. 2002) (internal quotation marks omitted).

Here, the publication (by the Forest Grove paper) and re-publication (by the Oregonian) are not violations of the statute at all.  And, even if they were, they are discrete, single incidents that could stand on their own as a cause of harm and are not part of a continuous pattern of alleged conduct that collectively establishes a tort or statutory violation.

37 - OPINION & ORDER

Additionally, according to the Forest Grove article published in September 2013, the investigation by the Oregon State Police and the District Attorney's Office into the allegations raised by the Corruption Complaint was already complete.  Ex. 12. to Thenell Decl.  Thus, the publication in the Forest Grove paper in September 2013 and the republication in the Oregonian in November 2013 of the signatories of the Corruption Complaint were not disclosures "during any investigation of the information provided by the employee[.]"

The continuing tort doctrine does not apply.

B.  Discovery Rule

Plaintiffs state that during discovery, they learned of an additional disclosure of the Corruption Complaint which allegedly occurred in November 2012 when Rubenstein ordered Noffsinger to deliver a copy of the Corruption Complaint to Kerry Aleshire, the former Forest Grove Police Chief.  Although the disclosure occurred outside of the limitations period, Plaintiffs assert they did not learn of this disclosure until taking Aleshire's deposition in a separate case in March 2014.  Thenell Decl. at ¶ 2.  Based on this, they argue that the disclosure by Noffsinger at Rubenstein's request is a separate violation of O.R.S. 659A.218 which was not actionable until discovered in March 2014 and thus, is timely.

Plaintiffs cite no law in support of their discovery rule argument.[9]  The Oregon Supreme

---

[9]  Plaintiffs do contend that while the state law statute of limitations applies, federal law determines when the limitations period accrues and "[f]ederal law applies the discovery rule in whistleblower claims."  Plfs.' Mem. at 14.  Plaintiffs are mistaken about the law and the case they cite in support, Roark v. United States, No. 06:12-cv-01354-AA, 2013 WL 1071778, at *3 (D. Or. Mar. 12, 2013), is not on point.  In Roark, the plaintiff brought a federal civil rights Bivens claim alleging constitutional violations by the United States government.  Because such constitutional claims have no federal statute of limitations, the law requires that the most analogous state statute of limitations be used.  Id.  Once the state's statute of limitations was

Court recently explained that

> [t]he discovery rule is "a rule of interpretation of statutes of limitation that has the
> effect of tolling the commencement of such statutes under certain circumstances."
> FDIC v. Smith, 328 Or. 420, 428, 980 P.2d 141 (1999).  Under the discovery rule,
> the period of limitations is deemed to have commenced from the earlier of two
> possible events: "(1) the date of the plaintiff's actual discovery of injury; or (2) the
> date when a person exercising reasonable care should have discovered the injury,
> including learning facts that an inquiry would have disclosed." Greene v. Legacy
> Emanuel Hospital, 335 Or. 115, 123, 60 P.3d 535 (2002) (emphasis in original);
> see also Kaseberg v. Davis Wright Tremaine, LLP, 351 Or. 270, 278, 265 P.3d
> 777 (2011) ("The discovery rule applies an objective standard—how a reasonable
> person of ordinary prudence would have acted in the same or a similar situation.").
>
> The existence of a discovery rule cannot be assumed, but rather must be embodied
> in the applicable statute of limitations.  See Gladhart v. Oregon Vineyard Supply
> Co., 332 Or. 226, 230, 26 P.3d 817 (2001).

Rice v. Rabb, 354 Or. 721, 725-26, 320 P.3d 554, 556-57 (2014).

Here, the applicable statute of limitations is found in O.R.S. 659A.875(6).  That statute

provides that "[n]otwithstanding ORS 30.275(9), a civil action . . . against a public body . . . , or

any officer, employee or agent of a public body . . . , based on an unlawful employment practice

must be commenced within one year after the occurrence of the unlawful employment

practice[.]"  O.R.S. 659A.875(6).  I found no Oregon or District of Oregon cases discussing

whether the discovery rule applies to O.R.S. 659A.875.  Defendants fail to discuss this issue in

their Reply Memorandum.

Without any governing caselaw already deciding the issue, the court applies "the statutory

[interpretation] methodology established in State v. Gaines, 346 Or. 160, 171-72, 206 P.3d 1042

---

determined, federal law applied to determine when the claim accrued because it was a federal
claim.  Id.  Roark has nothing to do with the accrual of a state statutory claim which is the issue
here.

(2009), to determine whether the legislature intended to incorporate a discovery rule in the pertinent statute of limitations." <u>Rice</u>, 354 Or. at 726, 320 P.3d at 557.  The first step is to examine the text and context of the statute.  <u>Id.</u>  Although not determinative, the statute here contains no express discovery rule provision.  <u>Id.</u> (noting "first" that the text of the statute in question did not expressly state that a discovery rule may be applied to toll the commencement of the limitation prescribed).

As to other words in the statute, two Oregon cases have examined statutes of limitations using the words "occur" or "occurrence," the latter being the same word as in O.R.S. 659A.875(6).  First, in <u>Gladhart v. Oregon Vineyard Supply Co.</u>, 332 Or. 226, 26 P.3d 817 (2001), the court discussed whether the discovery rule applied to a products liability statute of limitations which provided that the action "'shall be commenced not later than two years after the date on which the death, injury or damage complained of occurs.'"  <u>Id.</u> at 229, 26 P.3d at 818 (quoting O.R.S. 30.905(2)).  The court concluded that the ordinary meaning of the term "occurs" indicates that the cause of action runs from the time that the damage occurred and not from the discovery of that damage.  <u>Id.</u> at 231-34, 26 P.3d at 819-21.

Second, in <u>Huff v. Great Western Seed Co.</u>, 322 Or. 457, 909 P.2d 858 (1996), the court interpreted O.R.S. 659.121, the predecessor statute to the controlling statute here, O.R.S. 659A.875, and concluded that the discovery rule was not applicable to claims governed by that statute.  In <u>Huff</u>, the plaintiff brought a worker's compensation retaliation claim more than one year after the alleged unlawful employment practice.  The plaintiff argued that because the motive behind the alleged retaliatory actions was not discovered until some time after her

termination when a particular memorandum was discovered, the discovery rule applied and the statute of limitations should not begin to run until her discovery of the memorandum.

The court rejected the argument.  O.R.S. 659.121 provided that ". . . the civil suit or action shall be commenced within one year of the occurrence of the alleged unlawful employment practice."  The Huff court noted that the word "occurrence" was not defined in the statute.  Id. at 462, 909 P.2d at 860.  Although it determined that the word was not "self-defining" and that the dictionary definition was ambiguous, it found, based on the legislative history, that the Oregon Legislature opted to omit a discovery rule from discriminatory employment practice claims.  Id.  Thus, it concluded that the statute "does not incorporate an exception for plaintiffs who fail timely to discover their employers' discriminatory motive.  The limitations period provided therein commences with the occurrence of the unlawful conduct or 'practice' itself."  Id. at 464, 909 P.2d at 862-63.  Huff is instructive because it concerns the predecessor statute to the one at issue here.  And, because the Oregon Legislature defined O.R.S. 659A.218 as an unlawful employment practice and grouped it with other such practices in O.R.S. 659A.875, the Legislature intended claims under O.R.S. 659A.218 to be treated the same as other claims which are governed by O.R.S. 659A.875.

Additionally, in a case in this Court, Judge Aiken rejected the plaintiff's argument that his Oregon statutory whistleblower claim did not accrue until he received a written denial of the grievance he filed over his discharge, which had occurred several months earlier.  Koster v. Lane Reg'l Air Pollution Auth., No. 06:06-cv-06097-AA, 2008 WL 816680 (D. Or. Mar. 26, 2008).  The relevant statute of limitations was O.R.S. 659A.875, the same one applicable here.  Judge

Aiken held that under Huff, the "controlling date is that of the adverse employment action, and the Oregon Supreme Court has explained that the statute of limitations period commences with the occurrence of the unlawful conduct itself." Id. at *3 (citing Huff, 322 Or. at 464-65, 909 P.2d 858). Although not a "discovery rule" case, Koster is notable for applying the holding in Huff which construed former O.R.S. 659.121, to O.R.S. 659A.875.

Given the statute's lack of an express discovery provision and its use of the word "occurrence" which the Oregon Supreme Court interpreted in Gladhart to exclude application of the discovery rule, as well as the decision in Huff where the Oregon Supreme Court held that the Oregon Legislature intended to omit a discovery rule, the proper conclusion here is that the discovery rule does not apply to O.R.S. 659A.875(6) and thus, Plaintiffs' claims under O.R.S. 659A.218 are time barred.   I grant summary judgment to Defendants on the Oregon statutory whistleblower claims.

III. IIED Claims

Plaintiffs allege that the City and Drake inflicted severe emotional distress on them by disseminating the Corruption Complaint to Noffsinger, Rubenstein, and other City of Cornelius employees.  Compl. at ¶¶ 35, 48.  Monico adds that Summers inflicted emotional distress on him by prematurely disclosing the F&R to the District Attorney's Office which effectively placed Monico on the Brady List, and by placing him on administrative leave.  Id. at ¶ 49.  He also alleges that Summers inflicted further severe emotional distress on him by sending uniformed officers to his home, authorizing them to take up tactical positions around his home, and placing their hands on holstered firearms in front of his wife and children.  Id. at ¶ 50.  Finally, he

contends that Defendants forced him to perform menial cleaning and physical labor within the police department in front of his colleagues while on administrative leave which inflicted severe emotional distress on him. Id. at ¶ 51.

Defendants move for summary judgment on the IIED claims, contending that as a matter of law, the alleged acts do not constitute an extraordinary transgression of the bounds of socially tolerable conduct. I agree with Defendants.

To sustain their IIED claims, Plaintiffs must show that Defendants intended to inflict severe emotional distress, that Defendants' acts were the cause of Plaintiffs' severe emotional distress, and that Defendants' acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. McGanty v. Staudenraus, 321 Or. 532, 563, 901 P.2d 841, 849 (1995). Conduct that is merely "rude, boorish, tyrannical, churlish, and mean" does not support an IIED claim. Patton v. J.C. Penney Co., 301 Or. 117, 124, 719 P.2d 854, 858 (1986). "[T]he tort does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life even when the intentional conduct causing plaintiff's distress otherwise qualifies for liability." Hall v. The May Dep't Stores Co., 292 Or. 131, 135, 637 P.2d 126, 129 (1981); see also Watte v. Maeyens, 112 Or. App. 234, 237, 828 P.2d 479, 480-81 (1992) (no claim where employer threw a tantrum, screamed and yelled at his employees, accused them of being liars and saboteurs, then fired them all); Madani v. Kendall Ford, Inc., 312 Or. 198, 205-06, 818 P.2d 930, 934 (1991) (no claim where employee terminated for refusing to pull down pants).

In a 2008 case, the Oregon Court of Appeals explained the following parameters of the

tort:

> A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability. . . .
>
> * * *
>
> The classification of conduct as "extreme and outrageous" depends on both the character and degree of the conduct. As explained in the Restatement at § 46 comment d:
>
> > "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."
>
> Whether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances. We consider whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences.

House v. Hicks, 218 Or. App. 348, 358-60, 179 P.3d 730, 737-39 (2008) (internal quotations and citations omitted).

None of the alleged conduct here rises to the level required to support an IIED claim. As to the dissemination of the Corruption Complaint, the undisputed facts are that the Plaintiffs discussed the allegations with others before giving it to Drake and they wanted the public to learn about the allegations. As explained above, Plaintiffs concede that Drake's disclosure of the Corruption Complaint was necessary and inevitable. While they complain about the timing, they fail to establish harm from the timing. Given the undisputed facts, Drake's dissemination of the Corruption Complaint does not amount to an extraordinary transgression of the bounds of

44 - OPINION & ORDER

socially tolerable conduct.  Similarly, Summers's provision of the F&R to the District Attorney's

Office also does not support an IIED claim as a matter of law.  As explained above, this was a

public document which Summers provided to a public agency.  While Plaintiffs contend

Summers acted "prematurely," there is no independent harm that occurred as a result of the

timing.  Additionally, Summers's placement of Monico on administrative leave, right or wrong,

is not outrageous conduct in an employment setting.  Furthermore, the fact that the officers

intended to retrieve Monico's gun and badge was consistent with Monico being placed on

administrative leave.  The fact that the officers went to Monico's home may have been rude or

hostile, but it is not outrageous conduct.  The record does not support the assertion that the

officers "took up tactical positions," and even if it did, it is not sufficiently outrageous to support

the claim.  Finally, any assignment of what Monico considered to be "menial" jobs while on

administrative leave may also be rude or humiliating, but it does not "go beyond all possible

bounds of decency[.]"

       In response to the motion, Plaintiffs cite to some of the alleged retaliatory acts described

above in connection with the First Amendment claims, and contend that these further support

their IIED claims.  I reject this argument and conclude that Summers's alleged demeaning remark

about Watts having a learning disability, Summers's email to Monico in response to Monico's

criticisms of the new schedules, and Summers's hanging of the inspirational posters, do not,

either individually or collectively, constitute socially intolerable behavior so outrageous as to be

considered extreme and atrocious.  Thus, I grant summary judgment to Defendants on Plaintiffs'

IIED claims.

CONCLUSION

Defendants' summary judgment motion [31] is granted as to the Oregon statutory

whistleblower claims and the IIED claims, and is granted in part and denied in part as to the First

Amendment retaliation claims.  Accordingly, remaining in the case are the First Amendment

claims against Summers, the only remaining Defendant, for the allegedly adverse actions of

hanging the inspirational posters and placing Monico on administrative leave.

IT IS SO ORDERED.

Dated this ____6____ day of ____APRIL_____, 2015


Marco A. Hernandez
United States District Judge


46 - OPINION & ORDER